FIDELITY AND CASUALTY COMPANY OF NEW YORK V.
MORTON J. SMITH.

Decided December 24, 1902.

**Accident Insurance—Intentional Injury.**
   In suit on an accident policy, not insuring plaintiff against injuries intentionally inflicted by himself or others, evidence is considered and held to show that plaintiff's injury was intentionally inflicted, in self-defense, by one on whom he had made an attack, and judgment reversed and rendered.

Appeal from the District Court of McLennan. Tried below before Hon. Sam R. Scott.

*F. M. Etheridge,* for appellant.

*T. A. Blair,* for appellee.

KEY, ASSOCIATE JUSTICE.—This is a suit upon an accident insurance policy. There was a nonjury trial, resulting in a judgment for the plaintiff for $782.15, and the defendant has appealed. The testimony embodied in the statement of facts is as follows:

"Plaintiff put in evidence the policy sued on, which corresponds with the allegations of his petition with reference thereto. Said policy stipulates that 'in case of injuries, fatal or otherwise, intentionally inflicted upon himself by the assured, or by any other person, * * * the measure of the company's liability shall be a sum equal to the premium paid, same being agreed upon as in full liquidation of all claims under this policy.' It was agreed in open court that the amount of premium paid for the policy sued on was $37.50, and that prior to the institution of this suit the defendant tendered to the plaintiff that amount, which he declined to accept. It was further agreed that the policy was in full force and effect at the time the plaintiff was hurt, and that the plaintiff was totally disabled for a period of twenty-two weeks and two days, and that he was partially disabled for a period of twelve weeks, and that the premium for the policy sued on had been paid.

"W. E. Best, a witness for the plaintiff, testified orally as follows: I know about the injury sustained by the plaintiff. It happened, I believe, in April, 1901. In December, 1900, I was working for Smith Bros., and was laid off for two months. Smith Bros. were a firm of plaintiff and his brother Sidney Smith. Business was dull and I laid off for a couple of months, and had an offer of another position, and Smith Bros. expected to give me work again in the spring, as soon as business got better, and rather than see me take this other position they told me they would keep me on while business was dull if I would work for less salary than I had been, which I agreed to do, and worked on until about April. And so I told Mr. Sidney Smith that day, if it was right for him to cut my salary down in the winter time, it was no more than

right that he should raise my salary in the summer, on account of being longer hours and more business. He told me that he would let me know, and I went on that way a week or so, and he said that he had decided to get a man for less money. I said 'All right, I hope you can'—something like that; and I says, 'You haven't any fault to find with my services, have you?' and he said 'No, not exactly.' He then told me to see the plaintiff about it, and so one night the plaintiff and his wife were in the office, and I walked to the office where he was and told him I wanted to see him, and he came out where I was, and we sat down and talked for a while together, and I told him that I understood that he was going to get a cheaper man, and he said, yes, he was; that his brother Sidney was in favor of keeping down expenses. And I said, 'Sidney talked like he had some fault to find with my services,' and the plaintiff said, 'No, none at all.' I said, 'Well, I don't think you have treated me right, as long as I have been at work for you, and at the salary I have, to get a man now because you can get a cheaper man.' He said it was Sidney's wish, and he got angry at what I said and talked short, and both of us talked short to one another and he said, 'You must not give me any short talk,' and one word brought on another, and we both raised up at the same time, and he took his chair and I raised up and took the chair I was sitting in and held it in front of me, and he started to raise his chair like he was going to strike me, and I retreated with the chair in my hand, and he threw his chair at me, and some way in the scuffle he struck himself or I struck him.

"Here the witness was asked this question by the plaintiff's counsel: 'Q: Did you do it intentionally, or accidentally?' To which question and the proposed answer defendant objected, because every man is supposed to contemplate the natural and probable consequences of his act; which objection was overruled, and the witness was permitted to testify:

"A. 'No, sir; I did not do it intentionally. It was unintentional and accidental.' To which ruling of the court the defendant duly excepted.

"Cross-examination: Yes, sir; I know that I would not have struck the plaintiff at all if he had not been advancing upon me with a chair. I didn't know whether the chair was a deadly weapon or not. It was an ordinary chair with which the plaintiff was advancing upon me in a threatening attitude. I made no demonstration or threats of attack upon the plaintiff, and if he had not advanced upon me with that chair there would have been no difficulty. Had not the plaintiff been the aggressor, there would have been no fight. I did not bring on the difficulty in question. The plaintiff was the one who made the attack, and what I was doing was purely in self-defense. I would not have done anything to the plaintiff, if he had not done something to me. We had been good friends up to that time, and I had been in his service for a long time, and we are friends now. The plaintiff was totally disabled for a long time. The blow that I inflicted upon the plaintiff was in protecting myself. I was seated quietly when Mr. Smith came up. We were sitting

talking together. I told him that Sidney told me that he had decided to get a cheaper man, and he said that Sidney was in favor of cutting down expenses. I didn't ask him why in the hell he had fired me. I told him that Sidney had told me that they had decided to get a cheaper man, and he said yes, that Sidney was in favor of cutting down expenses. I then told him that I did not think he had treated me right by getting a cheaper man as long as I had worked for him. He then said, 'You need not talk short to me about it'—something like that. I then told him that I did not mean to talk short to him at all. I don't remember every word that was said. We both raised up together and he grabbed his chair, and as I have told you, he threw his chair. He raised up and threw his chair at me. I didn't feel bitter towards him then, but I didn't know how he felt towards me. I do know that he raised up and threw his chair at me. It was an ordinary chair, something like the one I had. The chair the plaintiff had would have inflicted serious bodily injury upon me in the hands of a man of ordinary strength if I had desisted from making any defense; I thought so at the time. I struck the plaintiff in the scuffle, and that was all there was to it. He only threw one chair at me. I didn't do anything after that; he was struck about that time by myself to protect myself. I struck him to keep him from making any further advances on me, and that in self-defense. I was simply acting defensively all the way through, and was simply trying to protect myself from his assault on me.

"Yes, the plaintiff advanced on me with a chair and I took up a chair to defend myself, and the plaintiff threw his chair at me; and he picked up the chair the second time, and about that time I struck him in warding off the blow he had aimed at me. It was unintentional. I did not know I had struck him until it was all over, it was done so quick. But I did intend to do whatever was necessary to protect myself in the premises.

"The plaintiff, Morton J. Smith, testified orally in his own behalf as follows: Myself and wife had been out from 2 o'clock to a funeral, and we drove in the barn just about dark. Mr. Best was sitting in a chair out there in front, and he turned around facing the back of the chair. We walked in there and I sat down. My wife went up and looked in the glass just a second, and I heard Mr. Best say, 'Morton, I want to speak to you.' I walked out and came around in front of him, and said, 'Do you want me?' And he said: 'I want to know why you fellers want to fire me.' And I said, 'Best, I don't know of anyone wanting to fire you;' and he said, 'You know God-damned well you fellers thought I tried to beat you out of six bits Sunday.' I said, 'Don't talk to me that way.' I thought my wife would hear him talking that way. I grabbed a chair and started towards him, and he threw his chair up in front of him, and stepped four or five steps backward, and I thought I was not going to catch him, and I was a little nervous and I threw my chair at him, and ran up at him, and he came down

with his chair or struck my chair. I dropped, but I did not know which one of the chairs hit me. I jumped up in a minute and Best stood there with his chair in his hand, and he dropped the chair down. He saw that I was going to fall a second time. He ran and picked me up and carried me in to the office, laid me down and put ice on me, and went for a doctor. That was the last I saw of Mr. Best. I had made an assault on him, and he was defending himself. Up to that time there had been no unkind feelings between us. There would not have been any trouble there if I had not made at him with a chair. I am a man of determination, and I am a little bit quick.

"Here the plaintiff was asked this question: 'Q. When you made at a man with a chair, with your impulsiveness and determination, do you expect him simply to lie down and let you hit him with a chair?'

"A. 'I don't allow no man to lie down on me. He might, if he wants to, but I would not advise him to do it. Yes, sir; under those circumstances I expect a fight. That is the way I always game myself up. At the time I picked up my chair Best started backwards, like he wanted to drop out. Yes, sir; he retreated and I thought I was not going to catch him, and I threw the chair at him when I saw him retreating. I then picked up the chair again and came back at him, and he got my lick. I was not expecting him to set there and let me beat him into a jellyfish. I was going through my own part; I was taking care of Morton Smith. I didn't know what he was going to do. It looked to me like he was going to back out of it. He had retreated up to the time I threw my chair at him, and it was then that he inflicted the injury upon me; but I didn't know which one of the chairs hit me, as the chairs ran together. Whatever injury I sustained was the result of that blow that Best inflicted upon me.' "

*Opinion.*—Counsel for the appellant contends that the undisputed testimony coming from the plaintiff and his witness Best shows that the former made an unprovoked assault upon the latter, and that the injuries sustained by the plaintiff were not accidental, but were intentionally inflicted by the witness Best, while defending himself against the assault.

This contention must be sustained. The testimony clearly shows an unjustifiable assault by the plaintiff upon the witness Best. It is true that Best stated that he did not intend to injure the plaintiff, and that the injuries inflicted were accidental, but on cross-examination he said: "I struck the plaintiff in the scuffle, and that was all there was to it. He only threw one chair at me. I didn't do anything after that. He was struck about that time by myself to protect myself. I struck him to keep him from making any further advances on me, and that in self-defense."

The language quoted shows that Best struck the plaintiff for the purpose of protecting himself; and while he may not have intended to inflict all the injury that was inflicted, his striking the plaintiff was

by design and not accidental. The plaintiff's testimony corroborates that given by Best as quoted above. The plaintiff said: "He had retreated up to the time I threw my chair at him, and I then grabbed the chair the second time and made at him, and it was then that he inflicted the injury upon me; but I don't know which one of the chairs hit me, as the chairs ran together. Whatever injury I sustained was the result of that blow that Best inflicted upon me."

We therefore hold that the judgment is not supported by testimony; and there being no conflict in the evidence, and no probability of the plaintiff's making a stronger case upon another trial, the judgment is reversed and judgment here rendered for the plaintiff for $37.50, the amount of the premium paid by him for the policy sued on. And as the defendant made a tender of that amount before the suit was filed, all the costs in both courts are taxed against the plaintiff.

*Reversed and rendered.*